**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES OSCAR WRIGHT,** | ) | |
| **Plaintiff** | ) | **C.A. No. 13-358 Erie** |
| | ) | |
| **v** | ) | **District Judge Rothstein** |
| | ) | **Magistrate Judge Baxter** |
| **DEBRA SAUERS, et al.,** | ) | |
| **Defendants** | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

## I. RECOMMENDATION

It is respectfully recommended that:

(1) The Commonwealth Defendants' motion for summary judgment [ECF No. 115] be granted in part and denied in part;

(2) Defendant Corizon Health, Inc.'s motion for summary judgment [ECF No. 137] be granted in part and denied in part; and

(3) The Motion for Summary Judgment of Defendants Wexford Health Sources, Inc. and Dr. Nancy McGarvie [ECF No. 140] be granted.

## II. REPORT

### A. Relevant Procedural History

Plaintiff, an inmate formerly incarcerated at the State Correctional Institution at Forest in Marienville, Pennsylvania ("SCI-Forest"), initiated this civil rights action on December 13, 2013, by filing a *pro se* complaint, pursuant to 42 U.S.C. § 1983.[1] Plaintiff subsequently filed an amended complaint, *pro se*, on May 5, 2014. [ECF No. 17]. Thereafter, counsel entered an appearance on behalf of Plaintiff on November 10, 2014, and filed a second amended complaint

on his behalf on or about January 5, 2015 [ECF No. 44]. Named as Defendants in the second amended complaint are: Debra K. Sauers, former Superintendent at SCI-Forest ("Sauers"); Michael Overmyer, former Deputy Superintendent for Facilities Management at SCI-Forest ("Overmyer"); Eric Tice, former Deputy Superintendent for Centralized Services at SCI-Forest ("Tice"); Corrections Officers Anthony Gatto ("Gatto"), D.E. Clever ("Clever"), and Lt. Raymond Burkhart ("Burkhart"); Nancy McGarvie, Medical Director at SCI-Forest ("McGarvie"); Kim Smith, Corrections Health Care Administrator at SCI-Forest ("Smith"); and Wexford Health Sources, Inc. ("Wexford").

On August 13, 2015, this Court issued a Report and Recommendation ("R&R") to deny the motion to dismiss, or in the alternative, motion for summary judgment filed by Defendants Wexford and McGarvie. [ECF No. 76]. The R&R was adopted by Order of District Judge Barbara Rothstein, dated September 10, 2015. [ECF No. 82]. Soon after, this Court entered an Order granting Plaintiff leave to file a third amended complaint to add Defendant Corizon Health, Inc. ("Corizon") as the employer of Defendant McGarvie. [ECF No. 89]. Plaintiff's third amended complaint was subsequently docketed on October 2, 2015 [ECF No. 90], and is the operative pleading in this case.[2] For ease of reference, all Defendants other than Defendants McGarvie, Wexford, and Corizon will be collectively referred to as "Commonwealth Defendants."

---

1 Plaintiff has since been released from prison and is represented by counsel.

2 No substantive changes were made to the second amended complaint other than the addition of Defendant Corizon. The third amended complaint merely states the same allegations against both Defendants Wexford and Corizon. All other Defendants, and the allegations against them, remain the same.

In his third amended complaint, Plaintiff claims that (1) Defendants Gatto, Clever, Sauers, Overmyer, and Tice violated his Eighth Amendment right to be free from cruel and unusual punishment by using and/or allowing the use of excessive force against him, and (2) Defendants Sauers, Overmyer, Tice, Gatto, Burkhart, Smith, McGarvie, Wexford, and Corizon were deliberately indifferent to his serious medical needs in violation of his Eighth Amendment rights. As relief for his claims, Plaintiff seeks injunctive relief and monetary damages.

The parties completed discovery on or about October 30, 2015. On January 14, 2016, the Commonwealth Defendants filed a motion for summary judgment as to all claims against them. [ECF N. 115]. On February 26, 2016, Defendant Corizon filed a motion for summary judgment as to Plaintiff's claims against it [ECF No. 137], and on February 29, 2016, Defendants Wexford and McGarvie filed their own motion for summary judgment as to all of Plaintiff's claims against them. Plaintiff has since filed a memorandum of law in opposition to each of Defendants' motions. [ECF Nos. 147, 149, and 151], Defendants have filed replies to Plaintiff's opposition memoranda [ECF Nos. 168, 171, and 181], and Plaintiff has filed a consolidated sur-reply to the replies of the Commonwealth Defendants and Defendants Wexford and McGarvie [ECF No. 172]. In addition, the parties recently stipulated to the dismissal of all of Plaintiff's claims against Defendants Wexford and Clever, and those Defendants have been terminated from this case, pursuant to this Court's Orders dated July 18, 2016. [ECF Nos. 175 and 176]. Defendants' motions are now ripe for consideration.

## B. Relevant Factual History[3]

### 1. Incident of July 23, 2012

On July 23, 2012, while Plaintiff was housed in SCI-Forest's restricted housing unit ("RHU"), Defendant Gatto and former Defendant Clever escorted Plaintiff to the RHU shower. (ECF No. 117, Commonwealth Defendants' Concise Statement of Undisputed Material Facts, at ¶¶ 1, 3). At the same time, security team officers Sharrar and Dombrowski went to Plaintiff's cell to conduct a random cell search. (Id. at ¶ 4). Plaintiff became upset in the shower because he did not want his cell searched. (Id. at ¶ 6). When Plaintiff finished his shower, he was handcuffed and escorted by Defendant Gatto and Clever to stand outside of his cell so he could be present for the cell search. (Id. at ¶ 10).[4] Defendant Gatto held Plaintiff by a tether during the escort. (Id. at ¶ 11). Plaintiff was angry that he was wet and did not have the opportunity to get dressed, and he stated three times that the officers could not search his cell. (Id. at ¶¶ 16-17). Nonetheless, Officer Dombrowski began to search Plaintiff's cell, which further angered Plaintiff. (Id. at ¶¶ 18, 20). Plaintiff became verbally aggressive, pulled and tugged on the tether, turned to face Defendant Gatto, and then forcefully kicked his left foot at Defendant Gatto's lower leg. (Id, at ¶¶ 26-28, 31; ECF No. 118-1, DVAR Video, at 2:39:28-49).[5] Defendant Gatto and Clever

---

3 The factual history recited herein is gleaned from the Defendants' concise statements of material facts [ECF Nos. 117, 137, 141], and Plaintiff's responses thereto [ECF Nos. 148, 150, 152], to the extent the facts are undisputed and/or amply supported by the factual record before this Court. Where there are discrepancies in the parties' interpretations of the documentary evidence of record, the Court draws from and cites the documents themselves.

4 Plaintiff denies that he asked to be present for the search. (ECF No. 148, Plaintiff's response to Commonwealth Defendants' Concise Statement of Material Facts, at ¶ 10).

5 Although Plaintiff disputes that he was verbally aggressive, pulled on the tether, and kicked Defendant Gatto with his left foot, the DVAR video footage of the incident conclusively affirms these facts.

immediately attempted to take Plaintiff to the ground, but Plaintiff resisted. (ECF No. 118-1, DVAR Video, at 2:39:50). When Plaintiff was ultimately brought to the ground, Clever fell on Plaintiff's right foot, causing Plaintiff to feel a sharp pain in the foot. (ECF No. 117, at ¶¶ 38-39; ECF No. 118-9, Plaintiff's Deposition Transcript, at pp. 17, 27).[6]

**2. Investigation of July 23, 2012 Incident**

On July 27, 2012, Plaintiff filed a grievance regarding the incident, in response to which an investigation was conducted by Lieutenant Carter ("Carter") of SCI-Forest's Security Department. (ECF No. 117, at ¶¶ 71-72). Carter reviewed the DIVAR video of the incident multiple times, and interviewed Defendant Gatto, Clever, Sharrar, and Dombrowski as part of his investigation. (Id. at ¶¶ 86, 89). As a result of his investigation, Carter concluded that all staff involved acted professionally and used the minimum amount of force necessary to control a combative inmate. (Id. at ¶ 90). Thus, no disciplinary action was recommended against any of the involved staff members. (Id. at ¶ 91). Defendants Tice, Overmyer, and Sauers reviewed Carter's report and agreed with his findings. ((Id. at ¶ 95). Defendant Sauers then sent the report to the OSII Director, James Barnacle. ((Id. at ¶ 96).

**3. Medical Treatment**

After the incident, Plaintiff was escorted to the triage room where he was examined by Michelle Grosch, RN ("Grosch"). During the examination, Plaintiff told Grosch that his right foot was stepped on by an officer during the unplanned use of force and that he was in pain and

6
The Court notes, and the parties acknowledge, that there is a twelve second gap in the DIVAR footage, during which Plaintiff was taken to the ground and the injury to his right foot occurred. Nonetheless, there appears to be no dispute that Plaintiff's foot injury occurred as a result of Clever coming into contact with it when Plaintiff was on the ground.

not able to move his toes. (Id. at ¶¶ 186-187). Grosch wrapped Plaintiff's foot, which was slightly swollen, gave Plaintiff Motrin for pain, and advised him to rest and keep his foot elevated. (Id. at ¶¶ 188-189). The next day, Defendant McGarvie issued orders for a coban wrap, ice, an x-ray of the right foot, "no work, yard, activities, sports until seen by PA/CRNP," bottom bunk/bottom tier status, Motrin 600 mg for 5 days, and follow-up within one week. (ECF No. 127, Plaintiff's medical records, at p. 143). An x-ray of Plaintiff's right foot was taken by Mobilex on July 26, 2012, and revealed "no fracture or dislocation in right foot." (ECF No. 127-4, Plaintiff's medical records, at p. 120).

On July 31, 2012, Plaintiff was seen by physician assistant Rhonda Sherbine ("Sherbine"), who observed edema and ecchymosis across Plaintiff's toes and ankle and noted his continued complaints of pain. As a result, Sherbine ordered a second x-ray of his right foot, and ordered an Ace wrap and Motrin, 400 mg, for 10 days. (ECF No. 141, Defendant McGarvie's Concise Statement of Material Facts, at ¶ 6). The same day, an x-ray of Plaintiff's foot was taken and revealed a 2nd, 3rd, and possibly 4th metatarsal LisFranc fracture. (Id. at ¶ 7). As a result, on August 7, 2012, Defendant McGarvie ordered that Plaintiff be placed in a posterior splint and Ace wrap, and given Motrin for ten additional days, a CT scan, an extra pillow, and a walker "for ambulation if needed." (ECF No. 117, at ¶ 198). The walker, however, was denied by security because Plaintiff was in the RHU. (Id. at ¶ 200). The posterior splint was a plaster half-cast covering the back of the foot and secured by Ace wraps, with cotton underneath. (Id. at ¶ 202). Although he was not advised by medical staff to do so, Plaintiff removed the splint three times per week for showers and once to go to yard. (Id. at ¶ 204).

On August 27, 2012, Plaintiff had a CT scan at Elk Regional Hospital, which revealed

"significant Lisfranc fracture dislocations involving the second, third and fourth metatarsal tarsal (Lisfranc) joints." (ECF No. 127-3, Plaintiff's medical records, at p. 101). Upon his return to SCI-Forest, Plaintiff was medically cleared to return to the RHU. (ECF No. 117, at ¶¶ 205-206). On September 19, 2012, during a medical appointment with Sherbine, Plaintiff was observed ambulating and weight-bearing on his right foot. (Id. at ¶ 207). On the same day, Defendant McGarvie arranged for Plaintiff to be seen by Dr. Kostopoulos, an orthopedic surgeon, on October 3, 2012. (ECF No. 141 at ¶ 23). On September 20, 2012, Plaintiff had an x-ray of his right foot, which was interpreted by Santiago Jimenez, M.D. of Mobilex, who noted, “No new fracture or dislocation is seen. Stable fracture deformities with a healing of the 2nd through 4th metatarsals with associated LisFranc joint injury, orthopedic consultation is advised.” (Id. at ¶ 24; ECF No. 127-4, Plaintiff’s medical records, at p. 117). On October 3, 2012, the date of his scheduled appointment with Dr. Kostopoulos, Plaintiff refused to go because he was denied access to a wheelchair for the trip. (ECF No. 141, at ¶ 25; ECF No. 152, Plaintiff’s Response, at ¶ 25).

On October 8, 2012, Plaintiff removed the splint from his right foot and left it in his cell before attending yard because it had been raining and he didn’t want the splint to get wet. (ECF No. 118-9, Plaintiff's Deposition Transcript, at p. 75). While Plaintiff was in the yard, the splint was removed from his cell by Defendant Burkhart. (ECF No. 141, at ¶ 26). On October 15, 2012, Plaintiff saw Sherbine at the Chronic Clinic, complaining of pain in his right foot. Sherbine noted that Plaintiff had tenderness over the second, third, and fourth metatarsals of his right foot, with minimal edema, and rescheduled his appointment with Dr. Kostopoulos for November 7, 2012. (Id. at ¶¶ 27-28). Plaintiff had a fourth x-ray of his right foot on November 6, 2012, which

showed stable alignment of the foot fractures without visible healing. (Id. at ¶ 31).

On November 7, 2012, Plaintiff was transported to Kane Hospital for his appointment with Dr. Kostopoulos, who noted that Plaintiff had a possible malunion of the second metatarsal and, thus, recommended surgical reduction and osteosynthesis. (Id. at ¶ 218). Defendant McGarvie approved Plaintiff for surgery on the same date and ordered a pre-operative CT Scan, which was performed at Kane Hospital on November 26, 2012. (Id. at ¶¶ 219-220). On December 4, 2012, Plaintiff was seen by Sherbine, who gave him a new Ace wrap and renewed his prescription for Motrin. (ECF No. 117, at ¶ 221).

On December 19, 2012, Plaintiff was brought to the infirmary to be kept overnight for his surgery, and was issued crutches for his post-surgery use. (Id. at ¶ 223). On December 20, 2012, Plaintiff was taken to Kane Hospital, where he underwent surgery to repair his right foot fracture, which included the insertion of a metal plate secured by three locking screws. (Id. at ¶ 224; ECF No. 127-3, Plaintiff's medical records, at p. 88). Plaintiff was returned to SCI-Forest the same day and was able to ambulate on crutches without difficulty. (ECF No. 117, at ¶ 225). Plaintiff was prescribed Vicodin for seven days, followed by Motrin, and was provided with a wheelchair. (Id. at ¶¶ 226-227). On December 26, 2012, Defendant McGarvie ordered a follow-up visit with Dr. Kostopoulos and provided Plaintiff with a wheelchair so he could attend Jum'ah prayer service. ((Id. at ¶¶ 234-235). On December 27, 2012, Plaintiff reported to Defendant McGarvie that Motrin was helping his pain; however, two days later he informed a nurse that he needed something stronger. (Id. at ¶¶ 236, 238). Plaintiff continued to use crutches through late December. (Id. at ¶ 237).

On January 3, 2013, Plaintiff had his follow-up appointment with Dr. Kostopoulos, and

his foot was placed in a cast. (Id. at ¶ 240). Plaintiff was told to continue using his crutches and was prescribed Motrin during the day and Vicodin at night for one week. (Id. at ¶ 241). Defendant McGarvie subsequently extended Plaintiff's Vicodin prescription, at night, until January 21, 2013. (Id. at ¶ 242). Defendant McGarvie also approved crutches, along with wheelchair for distance, and authorized bottom bunk/bottom tier status. (Id. at ¶ 243).

On February 1, 2013, Plaintiff returned to Kane Hospital to have his cast removed and to follow-up with Dr. Kostopoulos, who ordered that Plaintiff be partial weight-bearing on crutches for six weeks. (ECF No. 141, at ¶ 64). When Plaintiff returned to SCI-Forest following his cast removal, Defendant McGarvie ordered crutches and a wheelchair for six weeks; however, on February 7, 2013, the order for crutches and a wheelchair was discontinued and Plaintiff was, instead, provided with a cane. (Id. at ¶¶ 244-245). At an appointment on February 12, 2013, Plaintiff asked for something stronger than Motrin for pain, but when he was offered Mobic, a non-narcotic medication, he refused. (Id. at ¶¶ 247-248).

Plaintiff had a physical therapy appointment on March 6, 2013, and was given exercises to do. (Id. at ¶ 251). On March 6, 2013, Plaintiff was seen by Sherbine for a review of his restrictions, at which time Plaintiff returned his cane and signed an "against medical advice" form refusing restrictions related to his right foot. (ECF No. 141, at ¶ 69). On March 18, 2013, Plaintiff had another CT scan of his right foot and was seen by Dr. Kostopoulos, who ordered "weight bearing as tolerated," Tramadol 50 mg for pain, and possible removal of hardware (metal plate and screws) after a year. (Id. at ¶ 70).

On April 10, 2013, Plaintiff requested and was provided insoles and arch support for his feet to alleviate pain in his arches. (Id. at ¶ 73). Plaintiff attended physical therapy on June 3,

2013, at which time he had less complaints of pain in his foot, had functional range of motion in his ankle, decreased movement in his big toe, and was ambulating without assistive devices. (Id. at ¶ 77). On September 24, 2013, Plaintiff requested and received a larger elastic ankle support. (ECF No. 117, at ¶ 256). Plaintiff complained of foot pain on October 22, 2013, and Defendant McGarvie prescribed Naproxen and ordered an x-ray, which was taken the next day. (Id. at ¶ 257). The x-ray revealed no sign of any acute injury. (ECF No. 141, at ¶ 87).

On March 18, 2014, Plaintiff was seen by Dr. Rami Abraham complaining of right foot pain and asked for removal of the metal hardware because it was interfering with his daily activities. (ECF No. 141, at ¶ 96). Dr. Abraham ordered a consult for reevaluation with Dr. Kostopoulos, which occurred on April 14, 2014. At that time, Dr. Kostopoulos reported that Plaintiff was a candidate for hardware removal, and the surgery was approved on April 18, 2014. (Id. at ¶ 98; ECF No. 127, Plaintiff's medical records, at p. 22).

On May 15, 2014, Plaintiff underwent surgery to remove the hardware from his foot. (ECF No. 141, at ¶ 100). When Plaintiff returned to SCI-Forest, Dr. Abraham ordered a wheelchair for the day of surgery and then crutches for two to three weeks, as well as Percocet as needed for pain. (ECF No. 117, at ¶ 260). The next day, Dr. Abraham changed the wheelchair order to one week and the crutches to one month. (Id. at ¶ 263). Plaintiff returned his crutches on June 16, 2014, and was issued a cane. (Id. at ¶ 264). On September 22, 2014, Plaintiff had an x-ray of his right foot, which revealed "no acute fracture" and a "normal right foot." (ECF No. 127-4, Plaintiff's medical records, at p. 1).

**C. Standard of Review**

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted if

the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Under Rule 56, the district court must enter summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (19896). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323 quoting Fed.R.Civ.P. 56.

The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. Celotex, 477 U.S. at 330. See also Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007); UPMC Health System v. Metropolitan Life Ins. Co., 391 F.3d 497, 502 (3d Cir. 2004). When a non-moving party would have the burden of proof at trial, the moving party has no burden to negate the opponent's claim. Celotex, 477 U.S. at 323. The moving party need not produce any evidence showing the absence of a genuine issue of material fact. Id. at 325. "Instead, … the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Id. After the moving party has satisfied this low burden, the nonmoving party must provide facts showing that there is a genuine issue for trial to avoid summary judgment. Id. at 324. "Rule 56(e) permits a proper summary judgment motion to be

opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." Id. See also Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001); Garcia v. Kimmell, 2010 WL 2089639, at * 1 (3d Cir. 2010) quoting Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) (the non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue.").

In considering these evidentiary materials, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." Scott v. Harris, 550 U.S. 372, 378 (2007) (internal quotation marks and alterations omitted). See also Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001) (when applying this standard, the court must examine the factual record and make reasonable inferences therefrom in the light most favorable to the party opposing summary judgment).

When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. Anderson., 477 U.S. at 248, 255 ("only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 249. The court may consider any evidence that would be admissible at trial in deciding the merits of a motion for summary judgment. Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993).

## D. Discussion

### 1. Excessive Use of Force – Defendant Gatto

"In determining whether a correctional officer has used excessive force in violation of the Eighth Amendment, courts look to several factors including: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response." Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (citation omitted). The central question is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 7 (1992); Smith v. Mensinger, 293 F.3d 641, 649 (3d Cir. 2002) (citations omitted). "Force that exceeds that which is reasonable and necessary under the circumstances is actionable." Giles v. Kearney, 571 F.3d 318, 328 (3d Cir. 2009).

Here, there remains a genuine issue of material fact whether the amount of force used against Plaintiff was reasonable and necessary under the circumstances. In particular, the DIVAR video footage of the incident, which represents the best evidence of what occurred, is inconclusive, because the amount of force used to take Plaintiff to the ground and the force used while Plaintiff was on the ground are obscured by the twelve second gap in the video coverage. While the video footage does capture Plaintiff's belligerence immediately prior to the use of force, including his pulling on the tether and the forceful kick of his left leg in the direction of Defendant Gatto's legs and/or feet, it does not conclusively establish whether the amount of force applied by Defendant Gatto was reasonable and necessary, given the fact that Plaintiff was

handcuffed behind his back and tethered between two larger officers with no other inmates in the immediate vicinity. Without conclusive video evidence, the Court is left with disparate accounts of what occurred during and after the takedown, including the circumstances surrounding Plaintiff's right foot injury. These involve fact and credibility issues for a jury to decide. For these reasons, the Commonwealth Defendant's motion for summary judgment as to Plaintiff's excessive use of force claim against Defendant Gatto should be denied.

### 2. Excessive Use of Force - Supervisory Defendants

Plaintiff alleges that Defendants Sauers, Overmyer, and Tice (hereafter collectively referred to as "Supervisory Defendants") failed to adequately train and supervise their employees as to the appropriate use of force against inmates, failed to discipline Defendants Gatto (and Clever) when they used force against Plaintiff on July 23, 2012, and "demonstrated deliberate indifference to this obvious need for training and supervision by failing to adequately investigate Plaintiff's grievance" regarding Defendant Gatto's (and Clever's) use of force against him. (ECF No. 90, Third Amended Complaint, at ¶¶ 101-103). In their motion for summary judgment, the Commonwealth have construed Plaintiff's supervisory claims as three separate claims; however, Plaintiff has affirmed his intent to state a single "excessive force 'policy or practice' claim against the Supervisory Defendants." (ECF No. 147, Plaintiff's Opposition Memorandum, at pp. 15-16 n. 7). Plaintiff's claim will, thus, be addressed accordingly.

#### a. Exhaustion of Administrative Remedies

The Commonwealth Defendants first argue that Plaintiff has failed to exhaust his administrative remedies as to his claims against the Supervisory Defendants, in accordance with the requirements of the Prison Litigation Reform Act, 43 U.S.C. § 1997e(a) ("PLRA"), which

provides:

> no action shall be brought with respect to prison conditions under section 1983 of this title ... by a prisoner confined in any jail, prisons, or other correctional facility until *such administrative remedies as are available* are exhausted.

Id[7] (emphasis added).

The requirement that an inmate exhaust administrative remedies applies to all inmate suits regarding prison life, including those that involve general circumstances as well as particular episodes. Porter v. Nussle, 534 U.S. 516 (2002); Concepcion v. Morton, 306 F.3d 1347 (3d Cir. 2002) (for history of exhaustion requirement). Administrative exhaustion must be completed prior to the filing of an action. McCarthy v. Madigan, 503 U.S. 140, 144 (1992). Federal courts are barred from hearing a claim if a plaintiff has failed to exhaust all the available remedies. Grimsley v. Rodriquez, 113 F.3d 1246 (Table), 1997 WL 2356136 (Unpublished Opinion) (10th Cir. May 8, 1997).[8] The exhaustion requirement is not a technicality, rather it is federal law which federal district courts are required to follow. Nyhuis v. Reno, 204 F.3d 65, 73 (3d Cir. 2000) (by using language "no action shall be brought," Congress has "clearly required exhaustion").[9]

---

7

It is not a plaintiff's burden to affirmatively plead exhaustion. Jones v. Bock, 549 U.S. 199, 216 (2007) ("...failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints."). Instead, the failure to exhaust must be asserted and proven by the defendants. Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002).

8

Importantly, a plaintiff's failure to exhaust his administrative remedies does not deprive the district court of subject matter jurisdiction. Nyhuis v. Reno, 204 F.3d 65, 69 n.4 (3d Cir. 2000) ("...[W]e agree with the clear majority of courts that §1997e(a) is *not* a jurisdictional requirement, such that failure to comply with the section would deprive federal courts of subject matter jurisdiction.").

9

There is no "futility" exception to the administrative exhaustion requirement. Banks v. Roberts, 2007 WL 3096585, at * 1 (3d Cir.) citing Nyhuis, 204 F.3d at 71 ("[Plaintiff's] argument fails under this Court's bright line rule that

The PLRA also requires "proper exhaustion" meaning that a prisoner must complete the administrative review process in accordance with the applicable procedural rules of that grievance system. Woodford v. Ngo, 548 U.S. 81, 87-91 (2006) ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules ..."). Importantly, the exhaustion requirement may not be satisfied "by filing an untimely or otherwise procedurally defective ... appeal." Id. at 83; see also Spruill v. Gillis, 372 F.3d 218, 228-29 (3d Cir. 2004) (utilizing a procedural default analysis to reach the same conclusion) ("Based on our earlier discussion of the PLRA's legislative history, [...] Congress seems to have had three interrelated objectives relevant to our inquiry here: (1) to return control of the inmate grievance process to prison administrators; (2) to encourage development of an administrative record, and perhaps settlements, within the inmate grievance process; and (3) to reduce the burden on the federal courts by erecting barriers to frivolous prisoner lawsuits.").

**b. The Administrative Process Available to State Inmates**

So then, no analysis of exhaustion may be made absent an understanding of the administrative process available to state inmates. "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.' The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." Jones v. Bock, 549 U.S. at 218.

The DC-ADM 804 grievance system, available to state prisoners, consists of three

---

'completely precludes a futility exception to the PLRA's mandatory exhaustion requirement.'"). See also Woodford v. Ngo, 548 U.S. 81, 85 (2006) ("Indeed, as we held in *Booth*, a prisoner must now exhaust administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.").

separate stages. First, the prisoner is required to timely submit a written grievance for review by the facility manager or the regional grievance coordinator within fifteen days of the incident, who responds in writing within ten business days. Second, the inmate must timely submit a written appeal to intermediate review within ten working days, and again the inmate receives a written response within ten working days. Finally, the inmate must submit a timely appeal to the Central Office Review Committee within fifteen working days, and the inmate will receive a final determination in writing within thirty days. See Booth v. Churner, 206 F.3d 289, 293 n.2 (3d Cir. 1997), aff'd. 532 U.S. 731 (2001).

**c. Analysis**

In support of their assertion that Plaintiff has failed to exhaust his administrative remedies with regard to his supervisory claims, the Commonwealth Defendants have submitted the Declaration of Sarah Siegel, the Superintendent's Assistant at SCI-Forest, who declares, in pertinent part:

> 2. I have reviewed former Inmate James Oscar Wright's grievances and grievance history from July 2012 until March 2013. I have determined that former Inmate Wright never filed a grievance on the following subjects:
>
> a. **the Superintendent or Deputy Superintendents' failure to train or supervise their subordinates on the Department of Corrections' use of force policy**;
>
> b. a denial of assistive devices (wheelchair, walker, crutches) to allow him to keep weight off of his fractured foot;
>
> c. a denial by Officer Gatto of a request for crutches and a plastic bag in the context of getting a shower in the restricted housing unit; or

d. the Superintendent or Deputy Superintendents' failure to train or enforce proper health care protocol.

(ECF No. 118-4, Declaration of Sarah Siegel, at ¶ 2) (emphasis added).

In response, Plaintiff argues that he did, in fact, raise his claims against the Supervisory Defendants in two grievances: his initial excessive force grievance (No. 422147) against Defendant Gatto and Clever, which was fully exhausted; and his follow-up grievance (No. 428449) complaining about the lack of investigation into his excessive force allegations, which he claims he was blocked from fully exhausting his administrative remedies. Yet, neither of these grievances makes any claim against any of the Supervisory Defendants for failure to train or supervise their subordinates to follow excessive force policy or practice. The most that can be gleaned from either grievance is a generalized claim of the institution's failure to adequately investigate the July 23, 2012 incident that had already occurred. However, such a claim is not actionable against a supervisory official. See Rode v. Dellarciprete, 845 F.2d 1958, 1208 (3d Cir. 1988) (if an official's only alleged involvement is investigating and/or ruling on an inmate's grievance after the incident giving rise to the grievance has already occurred, there is no personal involvement on the part of that official); Cooper v. Beard, 2006 WL 3208783 at * 14 (E.D.Pa. Nov. 2, 2006).

Based on the foregoing, it is evident that Plaintiff has failed to properly exhaust his excessive use of force claims against the Supervisory Defendants and summary judgment should be entered in their favor, accordingly.

### 3. Medical Claim – Defendant McGarvie

Plaintiff claims that Defendant McGarvie was deliberately indifferent to his serious medical needs by denying him "prescribed medical devices (or reasonable alternatives) that would have allowed him to remain non-weight bearing," and by allowing "inordinate delays in Plaintiff's medical treatment" that "prevented Plaintiff from receiving necessary corrective surgery until it was too late." (ECF No. 151, Plaintiff's Opposition Memorandum, at p. 3).

In her motion for summary judgment Defendant McGarvie first argues that Plaintiff has failed to exhaust his administrative remedies as to his claims against her, citing Ms. Siegel's Declaration that Plaintiff never filed a grievance regarding "a denial of assistive devices (wheelchair, walker, crutches) to allow him to keep weight off of his fractured foot." (ECF No. 118-4, Declaration of Sarah Siegel, at ¶ 2b). In response, Plaintiff argues that his one and only medical grievance (No. 431502), filed on October 9, 2012 and re-filed on October 16, 2012 (ECF No. 118-3 at pp. 92, 94), adequately "addressed the deprivation of adequate medical care for his broken foot." (ECF No. 151, Plaintiff's Opposition Memorandum, at p. 5). In particular, Plaintiff argues that, in his appeals of the denial of Grievance No. 431592, he alluded to the denial of crutches, a wheelchair, and a plastic bag to put over his splint so that he could take a shower. (Id. at pp. 6-7). According to Plaintiff, these various complaints about his medical care throughout the administrative process regarding Grievance No. 431502 "alerted prison officials to the denial of adequate medical care for his broken foot." (Id. at p. 5). The Court disagrees.

It is evident from the face of Grievance No. 431502 that Plaintiff's principal complaint was confined to Defendant Burkhart's removal of his posterior splint from his cell on October 8,

2012. (ECF No. 118-3 at pp. 92, 94). There is no indication that Plaintiff was complaining about the adequacy of the medical treatment he was receiving from Defendant McGarvie or any other member of the medical staff. In her initial review response, Defendant Smith explains that the splint was similar to a cast that was to be left on until Plaintiff's follow-up with an orthopedic doctor, and that removal of the splint required Plaintiff to alter the cast in such a way as to render it useless, such that it could be considered contraband. (ECF No. 118-3 at p. 95). It was in response to these statements by Defendant Smith that Plaintiff makes reference in his appeals to the lack of crutches, a wheelchair, and a plastic bag, primarily as an explanation for his removal of the splint to take showers. (Id. at pp. 96, 100). The adequacy of Plaintiff's medical treatment by Defendant McGarvie was never the primary subject of the grievance, nor was Defendant McGarvie ever identified by name so as to put her, or anyone else, on notice that Plaintiff was asserting a claim against her.

Moreover, the grievance records indicate that Grievance No. 431502 was never fully exhausted in accordance with the dictates of DC-ADM 804. In her reply to Plaintiff's opposition memorandum, where it was first made clear that Plaintiff is relying upon Grievance No. 431502 as the underlying basis for his medical claim against her, Defendant McGarvie submitted the Affidavit of Dorina Varner, Chief Grievance Officer of the DOC Secretary's Office of Inmate Grievances and Appeals ("SOIGA"), who declares, in pertinent part:

> 3. I have been asked to review this Office's file for grievance number 431502, which I have done. Our file for this grievance also contains appeals brought by [Plaintiff] in grievances numbered 431496 and 435219….

> 4. These three grievances were dismissed by this Office without any decision on the merits because all three were procedurally defective in the same way – with regard to each of these three grievances, [Plaintiff] sent this Office only his handwritten appeal argument.
>
> 5. Pursuant to DC-ADM 804 (2010), in order to properly appeal a grievance to final review with this Office:
>
> > g. An inmate appealing a grievance to Final Review is responsible for providing the SOIGA with all required documentation relevant to the appeal. A proper appeal to Final Review must include photocopies of the Initial Grievance, Initial Review Response/Rejection, the Inmate Appeal to the Facility Manager, The Facility Manager/designee's decision and a written appeal to the SOIGA. Failure to provide the proper documentation may result in the appeal being dismissed.
>
> 6. With regard to all three grievances …, [Plaintiff's] appeals were dismissed without consideration because he failed to provide any of the underlying grievance, initial review, appeal to facility manager, or facility manager's decision with regard to any of them.

(ECF No. 168-1, Affidavit of Dorina Varner, at ¶¶ 3-6).

Plaintiff attempts to overcome this affidavit by arguing in his sur-reply that he was prevented from fully exhausting his final appeal because he was never given a confiscated items receipt by Defendant Burkhart that was required to be submitted with his grievance pursuant to DC-ADM 804. (ECF No. 172, Plaintiff's sur-reply, at pp. 3-5). Thus, Plaintiff would have this Court believe that the receipt was the essential documentation missing from his final appeal that resulted in its dismissal. This argument is nothing more than a red herring. Indeed, Plaintiff's Grievance No. 431502 was initially returned to him because it lacked a confiscated items receipt (ECF No. 118-3 at p. 94), but was subsequently accepted and processed through the initial review

and facility manager appeal stages without the receipt. To presume that the missing receipt ultimately became an issue again at the final review stage is folly, particularly in light of Ms. Varner's express declaration that the missing documentation consisted of "the underlying grievance, initial review, appeal to facility manager, [and] facility manager's decision…."

For the foregoing reasons, Plaintiff has failed to exhaust his administrative remedies with regard to his medical claim against Defendant McGarvie, and summary judgment should be granted in favor of Defendant McGarvie and against Plaintiff, accordingly.

**4, Medical Claim - Supervisory Defendants**

Plaintiff claims that the Supervisory Defendants "deliberately and indifferently failed to enforce compliance with proper health care procedures and failed to correct such serious deficiencies in the provision of medical care to the inmate population." (ECF No. 90, Third Amended Complaint, ¶¶ 118-120). The Commonwealth Defendants assert that Plaintiff failed to exhaust his administrative remedies with regard to this claim, as well, citing Ms. Siegel's declaration that Plaintiff has "never filed a grievance" regarding "the Superintendent or Deputy Superintendents' failure to train or enforce proper health care protocol." (ECF No. 118-4, Declaration of Sarah Siegel, at ¶ 2d).

In response, Plaintiff again argues that all of his medical claims are couched within the one and only medical grievance he filed on October 9, 2012 (No. 431502), in which he complained about Defendant Burkhart's removal of his posterior splint from his cell on October 8, 2012. (ECF No. 147, Plaintiff's Opposition Memorandum, at p. 26). As discussed more fully above, however, the subject of this grievance was specifically confined to Defendant Burkhart's

actions on October 8, 2012. None of Plaintiff's complaints allege a failure to enforce proper health care procedures by supervisory officials, nor are any of the Supervisory Defendants mentioned by name so as to put them on notice of Plaintiff's claims against them. Moreover, as already noted, Plaintiff never fully exhausted his administrative remedies with regard to Grievance No. 431502. Thus, Plaintiff has failed to exhaust his administrative remedies as to his medical claims against the Supervisory Defendants, and summary judgment should be entered in their favor on such claims.

### **5. Medical Claim – Defendant Gatto**

Plaintiff alleges that Defendant Gatto was deliberately indifferent to his serious medical needs by denying his "reasonable requests for crutches and a plastic bag to protect his medical boot from moisture." (ECF No. 90, Third Amended Complaint, at ¶¶ 113-114). The Commonwealth Defendants have moved for summary judgment on this claim based on Plaintiff's failure to exhaust administrative remedies, citing Ms. Siegel's declaration that Plaintiff never filed a grievance regarding "a denial by Officer Gatto of a request for crutches and a plastic bag in the context of getting a shower in the restricted housing unit." (ECF No. 118-4, Declaration of Sarah Siegel, at ¶ 2c).

In response, Plaintiff once again argues that his medical grievance of October 9, 2012 (No. 431502), regarding Defendant Burkhart's removal of his posterior splint from his cell, addressed numerous medical issues, including those raised against Defendant Gatto. Yet, the only mention of a denial of crutches or a plastic bag occurred within the context of his appeal and re-appeal to the Superintendent from the denial of Grievance No. 431502, and neither identified

Gatto as the person responsible for denying the crutches or a plastic bag. (ECF No. 118-3, at pp. 96, 100). This was not sufficient to put Defendant Gatto, or anyone else, on notice of this claim and, thus, did not constitute proper exhaustion of administrative remedies. Furthermore, as discussed above, Grievance No. 431502 was never fully exhausted by Plaintiff. Accordingly, summary judgment should be entered in favor of Defendant Gatto and against Plaintiff on this claim.

**6. Medical Claim – Defendant Burkhart**

Plaintiff alleges that Defendant Burkhart was deliberately indifferent to his serious medical needs when he removed his posterior splint from his cell on October 8, 2012. As has already been discussed, the underlying grievance for this claim (No. 431502) was never fully exhausted by Plaintiff. As a result, summary judgment should be entered in favor of Defendant Burkhart due to Plaintiff's failure to exhaust his administrative remedies on this claim.

**7. Medical Claim – Defendant Smith**

Plaintiff alleges that Defendant Smith "had reason to believe that the SCI Forest Medical Department was failing to properly treat Plaintiff," yet "she denied his numerous grievances complaining of improper treatment and suggested that Plaintiff was seeking narcotic medication for its addictive properties." (ECF No. 90, Third Amended Complaint, at ¶ 112). In particular, Plaintiff argues that Defendant Smith knew that Plaintiff's posterior splint was removed from his cell by Defendant Burkhart, but did nothing to procure a replacement or to ensure that Defendant McGarvie was aware of the splint's removal.

When a supervisory official is sued in a civil rights action, liability can only be imposed if

that official played an "affirmative part" in the complained-of misconduct. Chinchello v. Fenton, 805 F.2d 126, 133 (3d Cir. 1986). The supervisor must be personally involved in the alleged misconduct. Rode v. Dellarciprete, 845 F.2d 1958, 1207 (3d Cir. 1988). Section 1983 liability cannot be predicated solely on *respondeat superior*. Rizzo v. Goode, 423 U.S. 362 (1976); see also Monell v. Department of Social Services, 436 U.S. 658 (1978) (superiors of line officers who act in violation of constitutional rights may not be held liable on a theory of vicarious liability merely because the superior had a right to control the line officer's action). If a grievance official's only involvement is investigating and/or ruling on an inmate's grievance after the incident giving rise to the grievance has already occurred, there is no personal involvement on the part of that official. Rode, 845 F.2d at 1208; Cooper v. Beard, 2006 WL 3208783 at * 14 (E.D.Pa. Nov. 2, 2006).

Here, Plaintiff's claims against Defendant Smith arise from her role as the officer responsible for reviewing and responding to Plaintiff's grievances, particularly Grievance No. 431502 regarding Defendant Burkhart's removal of Plaintiff's posterior splint from his cell. This is not sufficient to establish Defendant Smith's personal involvement in the alleged constitutional violations at issue. Rode, 845 F.2d at 1208. Moreover, to the extent Grievance No. 431502 forms the underlying basis for Plaintiff's claim against Defendant Smith, it has already been established that such grievance was never fully exhausted by Plaintiff. For these reasons, summary judgment should be granted in favor of Defendant Smith and against Plaintiff on this claim.

**8. Medical Claim – Corizon Health, Inc.**

Plaintiff claims that Defendant Corizon was "directly involved in the violations of

Plaintiff's Eighth Amendment rights" by, *inter alia*, failing to provide Plaintiff with medical equipment and treatment recommended by doctors, failing to properly train and supervise members of its staff, and continually denying Plaintiff's reasonable requests for medical treatment. (ECF No. 90, Third Amended Complaint, at ¶ 124).

It is well-settled that a private corporation cannot be held liable under § 1983 for constitutional violations committed by its employees under a theory of *respondeat superior* or vicarious liability. See Natale v. Camden County Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003); Durmer v. O'Carroll, 991 F.2d 64, 69 n. 14 (3d Cir. 1993); Ramos-Vasquez v. PrimeCare Medical, Inc., 2010 WL 3855546, at *8 (E.D.Pa. Sept. 30, 2010). Thus, a private entity like Defendant Corizon will be liable only if Plaintiff can provide evidence that the alleged constitutional violation was the result of the entity's policy, procedure or custom. Natale, 318 F.3d at 583-84, citing Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404 (1997); Bielevicz v. Dubinon, 915 F.2d 845, 849-50 (3d Cir. 1990). In addition, Plaintiff must establish a "plausible nexus" or "affirmative link" between the policy and the constitutional deprivation at issue. Hampton v. Whetzel, 2016 WL 815559, at *3 (M.D.Pa. Mar. 2, 2016), citing Bielivicz, 915 F.2d at 850.

"For purposes of § 1983 analysis, a policy is made when a decision-maker with final authority to establish such a policy issues an official proclamation, policy, or edict." Hampton, at *3, citing Andres v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990); Unterberg c. Corr. Med. Sys., Inc., 799 F.Supp. 490, 497-98 (E.D.Pa. 1992). On the other hand, a custom "can be proven by showing that a given course of conduct, although not specifically endorsed or

authorized by law, is so well-settled and permanent as virtually to constitute law." Bielivicz, 915 F.2d at 850. A policy or custom may also exist where "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.'" Natale, 318 F.3d at 584, quoting Bryan County, 520 U.S. at 417-18.

**a. Policy or Custom**

Here, Plaintiff acknowledges that the policies and procedures that were employed by Defendant Corizon to oversee clinical care at SCI-Forest were promulgated by the DOC; yet, Plaintiff argues that Corizon was liable for its failure to enact "policies or procedures of its own to address the provision of reasonable alternative medical care when medical orders for special medical items implicated security concerns." (ECF No. 149, Plaintiff's opposition memorandum, at p. 7 (internal p. 6)). In making this argument, however, Plaintiff references various provisions of DOC Policy 13.2.1 and 13.1.1 that pertain to the provision of ambulatory devices and special medical items. (Id. at pp. 8-10 (internal pp. 7-9)). In fact, Plaintiff acknowledges that "[t]he DOC policies adopted by Corizon addressed the provision of necessary special medical items in general and when security concerns were implicated." (Id. at p. 8 (internal p. 7). Thus, appropriate policies were already in place, they simply weren't followed, according to Plaintiff. Defendant Corizon cannot be held liable for failing to enact policies that are already in place, and summary judgment should be granted as to Plaintiff's claim that Defendant Corizon failed to enact a policy to address the provision of reasonable alternative medical care when special

medical items implicate security concerns.

Alternatively, Plaintiff asserts that, "a reasonable jury could find that the DOC policy adopted by Corizon to address such situations at SCI-Forest where special medical items raised security concerns was reasonable, but that Corizon and its employees had a custom of simply not following it." (Id. at p. 12 (internal p. 11). The Court agrees. Because Defendant Corizon has failed to sufficiently respond to whether Plaintiff can establish the presence of a custom of not following established policies governing the provision of special medical items when security concerns are raised, there are enough genuine issues of material fact to deny summary judgment as to this claim.

**b. Failure to Train or Supervise**

Plaintiff next claims that Defendant Corizon failed to train and supervise its employees regarding necessary medical treatment when medical items raised security concerns. "In order to establish liability on a failure to train claim under § 1983, a plaintiff 'must identify a failure to provide specific training that has a causal nexus with their injuries and must demonstrate that the absence of that specific training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred.'" Ziegler v. PHS Corr. Health Care, Inc., 2012 WL 1971149, at *6 (W.D.Pa. June 1, 2012), quoting Conn v. Bull, 307 Fed. App'x 631, at *3 (3d Cir. 2009) (internal quotations omitted).

Here, Plaintiff notes that Defendant McGarvie testified at her deposition that she had received no training from Corizon at all, let alone training regarding special medical items that implicated security concerns. (ECF No. 164-1, Defendant McGarvie's deposition transcript, at

pp. 12-13 (internal pp. 39-40)). In addition, Defendant Corizon's designated representative, Dr. Jimmy Webster, testified that no training was provided to its medical employees regarding the DOC policy that required discussion, consultation, and resolution whenever special medical items raised security concerns. (ECF No. 153-2, Dr. Jimmy Webster deposition transcript, at p. 117 (internal p. 85)). According to Plaintiff, this lack of training led to the medical staff's failure to provide him with alternative non-weightbearing medical items or an alternative plan during the five months that he walked on a broken foot before his first surgery. (ECF No. 149, Plaintiff's opposition memorandum, at p. 15 (internal p. 14)). Defendant Corizon has not specifically addressed Plaintiff's allegations of a failure to train or supervise in this regard. Thus, the Court finds that there are enough genuine issues of material fact to deny summary judgment as to this claim and to allow it to proceed to trial.

**c. Excessive Delay in Medical Care**

Finally, Plaintiff claims that Defendant Corizon is liable for the excessive delays in providing medical treatment for Plaintiff's foot. However, the medical record is devoid of excessive delays and denials of medical treatment that would implicate deliberate indifference to Plaintiff's serious medical needs. At most, Plaintiff has raised a medical negligence claim, which does not implicate a constitutional violation under Section 1983.[10] Thus, summary judgment

---

10 Indeed, Plaintiff's claim in this regard is based, in large part, upon the expert opinion of Stephen F. Conti, M.D., who opines, in pertinent part, "[a]ppropriate management would have been surgical intervention to place the bones [of Plaintiff's right foot] back into anatomic position, which is known as open reduction and internal fixation. This would have prevented displacement of the bones causing the malunion and nonunion that Dr. Kostopoulos needed to operate on and would have significantly decreased the chance that [Plaintiff] would develop midfoot arthritis, which would have avoided the surgery most recently performed by Dr. Wen Chao. Mr. Wright's care was below the standard that existed in 2012." (ECF No. 153-1, Declaration of Stephen F. Conti, at ¶ 23).

should be granted in favor of Defendant Corizon on this claim.

## III. CONCLUSION

For the foregoing reasons, it is respectfully recommended that:

(1) The Commonwealth Defendants' motion for summary judgment [ECF No. 115] be DENIED as to Plaintiff's claim of excessive use of force against Defendant Gatto, and GRANTED in all other respects;

(2) Defendant Corizon Health, Inc.'s motion for summary judgment [ECF No. 137] be DENIED as to Plaintiff's claim that Defendant Corizon and its employees had a custom of not following established policies regarding the provision of special medical items that implicate security concerns; DENIED as to Plaintiff's claim that Defendant Corizon failed to train or supervise its employees regarding the provision of special medical items that implicate security concerns; and GRANTED as to all other claims; and

(3) The Motion for Summary Judgment of Defendants Wexford Health Sources, Inc. and Dr. Nancy McGarvie [ECF No. 140] be GRANTED.

All Defendants other than Defendants Gatto and Corizon should be terminated from this case.

In accordance with the Federal Magistrates Act, 28 U.S.C. § 636(b)(1), and Fed.R.Civ.P. 72(b)(2), the parties are allowed until September 15, 2016 to file written objections to this report and recommendation. Any party opposing the objections shall have until September 29, 2016 to respond thereto. Failure to file objections will waive the right to appeal. Brightwell v. Lehman,

637 F. 3d 187, 193 n. 7 (3d Cir. 2011).

s/Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge

Dated: September 1, 2016

cc: The Honorable Barbara Rothstein
United States District Judge